UNITED STATES *v.* BORGFELDT & Co. (No. 301). UNITED STATES *v.* STONE & DOWNER CO. (No. 302).[1]

DECALCOMANIA TRANSFERS—LITHOGRAPHIC PRINTS.
Decalcomanias for ceramic decoration, the decorating to be done by transferring the figures and designs from the paper to pottery and fixing them on the pottery by burning or baking, are lithographic prints and were dutiable as such within the meaning of paragraph 400, tariff act of 1897.

United States Court of Customs Appeals, October 12, 1911.

APPEAL from Board of United States General Appraisers, G. A. 7035 (T. D. 30687).

[Affirmed.]

*D. Frank Lloyd, Assistant Attorney General* (*Martin T. Baldwin* on the brief), for the United States.
*Comstock & Washburn* (*Albert H. Washburn* of counsel) for appellees.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

SMITH, Judge, delivered the opinion of the court:

In these cases merchandise known as decalcomanias or decalcomanias in sheets was imported at the ports of Boston and New York and assessed for duty by the collectors of customs at those places at 3 cents per pound and 20 per cent ad valorem under the provisions of paragraph 398 of the tariff act of 1897, which reads as follows:

398. *Surface-coated papers not specially provided for in this act, two and one-half cents per pound and fifteen per centum ad valorem; if printed, or wholly or partly covered with metal or its solutions,* or with gelatin or flock, *three cents per pound and twenty per centum ad valorem;* parchment papers, two cents per pound and ten per centum ad valorem; plain basic photographic papers for albumenizing, sensitizing, or baryta coating, three cents per pound and ten per centum ad valorem; albumenized or sensitized paper or paper otherwise surface coated for photographic purposes, thirty per centum ad valorem.

Borgfeldt & Co., the importers at New York, protested that the decalcomanias imported by them were lithographic prints and as as such were dutiable at 20 cents per pound under paragraph 400, the pertinent parts of which are as follows:

400. Lithographic prints from stone, zinc, aluminum or other material, bound or unbound * * * on paper or other material not exceeding eight one-thousandths of one inch in thickness, twenty cents per pound; on paper or other material exceeding eight one-thousandths of one inch and not exceeding twenty one-thousandths of one inch in thickness, and exceeding thirt -five square inches, but not exceeding four hundred square inches cutting size in dimensions, eight cents per pound; exceeding four hundred square inches cutting size in dimensions, thirty-five per centum ad valorem; * * * [Then follow specific provisions for various special kinds of lithographs.]

The Stone & Downer Co., the importers at Boston, claimed that the decalcomanias which they imported were dutiable either as litho-

[1] Reported in T. D. 31945 (21 Treas. Dec., 372).

graphic prints under said paragraph 400, or at 2½ cents per pound and 15 per cent ad valorem as surface-coated paper not specially provided for under the first clause of paragraph 398, or at 25 per cent ad valorem either as "all other paper not specially provided for," or as "printed matter * * * not specially provided for" under paragraphs 402 and 403, which said paragraphs are as follows:

402. Paper hangings and paper for screens or fireboards, and *all other paper not specially provided for* in this act, twenty-five per centum ad valorem; all Jacquard designs of one line paper, or parts of such designs, finished or unfinished, thirty-five per centum ad valorem; all Jacquard designs cut on Jacquard cards, or parts of such designs, finished or unfinished, thirty-five per centum ad valorem.

403. Books of all kinds, including blank books and pamphlets, and engravings bound or unbound, photographs, etchings, maps, charts, music in books or sheets, and *printed matter*, all the foregoing *not specially provided for* in this act, twenty-five per centum ad valorem.

The two protests were tried separately by the board, but the testimony taken in one case was made a part of the record in the other in so far as it might be material or pertinent to the issue, and to this method of procedure ordered by the board neither party now makes objection.

The claim of both protestants that the decalcomanias were lithographic prints was sustained by the Board of General Appraisers and the Government appealed.

It appears from the record and samples in evidence that the merchandise consists of sheets of paper 20 by 30 inches in size, covered with colored designs or figures repeated over and over again. The goods are imported for ceramic decoration, which is accomplished by transferring the figures and designs from the paper to pottery and fixing them there by burning or baking. The designs or figures referred to are the creations of an artist and are originally sketched by him in water colors. The sketch is then sent to a lithographer, who reproduces on transparent paper or celluloid the outlines of each color, and thus constitutes the pattern from which the outlines of the several colors are separately transferred by him to as many lithographic stones as there are colors. That is to say, each color is separately outlined on the stone and there are as many outlines placed on as many stones as there are colors in the design or figure. The outlines on the several stones are then etched out with acid by the lithographer, and thus is defined and established a printing surface for the color assigned to each particular stone. So etched, the several stones are ready for the press and the reception of their corresponding colors. The colors are either metals or metallic oxides which, with a flux and in the form of a powder, are mixed with printing oil and then spread on metal rollers covered with leather. These rollers are carried over the stone and ink its printing surface with the proper pigment. From the inked stones the sev-

eral colors in their proper order are impressed in succession on appropriate paper until the design or figure is complete.

The paper upon which the decalcomania is printed is of a particular kind and quality, and is manufactured abroad by a process the details of which are fully known only to those who make a specialty of its manufacture. There are two grades of the paper, one known as simplex and the other as duplex paper. As far as we are able to gather, the simplex is a single layer of paper, while the duplex is composed of a thin, porous layer of tissue paper, bound by suction, it is said, to a layer of strong white paper, which serves as a backing. To serve the purpose of making decalcomanias, the paper, whether it be simplex or duplex, is surfaced with a solution of starch, and this in its turn is coated with dextrin or gum, the duplex paper being surfaced on the tissue-paper side. This coating of dextrin or gum receives from the stones the colored design or figure, and accomplishes, it seems, the double object of preventing the colors from running into the starch and paper and of fastening the design to the pottery. The layer of starch, on its part, prevents the gum from sticking to the paper, and when moistened with water permits the withdrawal of the paper, thus leaving the design or figure attached by the gum to the article to be decorated. The design or figure is then permanently fixed to the pottery by burning or baking. This briefly describes the process of manufacturing the decalcomanias and the commercial use to which they are put after completion.

The Government contends, first, that the goods under discussion are not lithographic prints; second, that the merchandise is surface-coated paper, wholly or partly covered with metal or its solutions; third, that if it be not surface-coated paper covered with metal or its solutions, it is surface-coated paper printed, or printed matter; and fourth, that if it be not surface-coated paper, it is paper not specially provided for.

We think that the evidence in the record clearly shows that the goods in question are lithographic prints within the meaning of paragraph 400 of the tariff act of 1897. The witnesses both for the Government and the importers do not differ materially as to the methods of manufacture and in effect agree that in all essential particulars the processes employed in the making of the ordinary lithographic print are substantially followed in the manufacture of the decalcomanias under consideration. The decalcomanias in question are printed in a lithographic establishment on a lithographic press from a lithographic stone, on which the design or figure has been first traced in lithographic ink and then etched out and prepared for printing by a lithographer. There are, it is true, some differences between the surface-coated paper upon which from 90 to 95 per cent of the ordinary lithographs are printed and the specially surface-

coated paper upon which decalcomanias are impressed. These are differences, however, which do not affect the lithographic character of decalcomanias, but are rather differences which facilitate the use of lithographic prints for a special definite purpose. That is to say, the fact that a lithographic print is so made that it may be transferred to some object for the purposes of ornamentation makes it none the less a lithographic print because of that particular use of it. In this connection it might be well to observe that there is nothing in the make-up of the ordinary lithograph which necessarily or absolutely precludes the transfer of its colored design, figure, or picture to some other object. In fact the evidence is uncontradicted that long prior to the creation of the decalcomania the colors of lithographs were so transferred by pasting the color side to glass and then removing the paper after wetting it. True, such a transfer was done for amusement and was too laborious a process for commercial purposes. Nevertheless, the fact that the common lithograph could be and was so used is of value to show that feasibility of transfer is common to lithographs and decalcomanias. The fact that the decalcomania can be transferred more readily than the ordinary lithograph is important only to the extent that it shows that the decalcomania is an evolution of the lithograph. When the decalcomania was invented the custom of transferring lithographs became obsolete, and for 20 years the former served no other purpose than that of furnishing the amusement which transfers of the latter had originally afforded. That in the course of time a commercial use was found for the decalcomania makes it none the less a creation of lithography and none the less a lithographic print.

The Government also argues that the decalcomanias imported differ from lithographic prints in that some of the colors are not printed from the stone but are dusted on after the paper has left the press. We think the dusting on of the colors is like the special coating of the paper, a mere development of lithographic processes. In practice it was found that the first impression of some of the colors was too faint and that a repetition of the impress was necessary in order to accentuate them and make them more vivid. Moreover, experience proved that from the friction of repeated printing the printing surface of the stone was worn away to such a degree by certain metallic colors that sharpness of impression could not be obtained. To save the labor and cost of repeating the printing and to diminish the wear on the stone, manufacturers finally resorted to the device of dusting on the colors after the impress was taken and while it was still wet. At first dusting was done by hand, and later machinery for the purpose was introduced and used, although hand dusting is still followed, to some extent, especially where the more costly colors are used. Dusting, whether done by hand or machinery,

is not peculiar, however, to decalcomanias. It is a method which may be and is actually employed in the making of ordinary lithographs and may be fairly considered in no other light than a natural and economic development of the art of lithography resulting from experience and the natural commercial tendency to reduce the cost of production.

As to the point made that the design or figure for ceramic decalcomanias is put upon the stone reversed as compared with the design or figure etched for the ordinary lithograph, it is sufficient to say that decalcomanias, even for pottery, are not always so made. Whether the picture is reversed or not depends entirely upon the design. If the design is such that the printing of it from a positive or negative stone makes no difference in the effect produced, the etching need not be reversed. If the picture when transferred to the pottery would present the appearance of having been put on "wrong end to" the etching is the reverse of that which would be employed for a chrome lithograph. For tariff purposes there is no real distinction, in our opinion, between negative and positive decalcomanias. The reversing of the etching is purely incidental to the design and the effect to be produced, and whether the decalcomania is printed from a positive etching—that is to say, from an etching the reverse of that used for the common lithograph, or from a negative etching, the same as that employed for such a lithograph—it is still a lithographic print. In one case the decalcomania may be called a negative lithographic print and in the other a positive lithographic print, but for all that both are lithographic prints. See United States *v.* Sussfield (1 Ct. Cust. Appls., 51); Edison *v.* Lubin (122 Fed. Rep., 240–242); Edison Mutoscope & Biograph Co. *v.* Edison Mfg. Co. (137 Fed. Rep., 262–266).

If we had any doubt as to whether the decalcomanias under discussion are properly dutiable as lithographic prints, that doubt would be dispelled by what seems to have been a very long-continued departmental practice. The tariff provision for lithographic prints appeared for the first time in the tariff act of 1890. From the date of the passage of that act until the year 1907, a period of 17 years, decalcomanias were assessed for duty as lithographic prints. Their classification as such prints seems to have been questioned for the first time about the year 1903 by the firm of Wakem & McLaughlin, of Chicago. This firm, representing Meyercord & Co., imported certain decalcomanias, which were classified by the collector as lithographic prints and accordingly assessed for duty at 20 cents per pound under paragraph 400 of the tariff act of 1897. The importers, frankly admitting that they represented domestic manufacturers of decalcomanias and desired a higher rate of duty, protested that the goods were labels printed in whole or in part of metal leaf and there-

fore dutiable at 50 cents a pound.   The Board of General Appraisers overruled the protest, but its decision was subsequently reversed by the Circuit Court for the Northern District of Illinois, Kohlsaat, judge, no opposition being presented by the Government.   The decision of the Circuit Court, however, was not followed by the Treasury Department, which, after taking the opinion of the Attorney General, announced that it was not incumbent upon the department to accept the ruling of the court and instructed customs officers to continue to impose the rate of 20 cents per pound on such merchandise as lithographic prints.   (T. D. 25848.)

The practice of classifying decalcomanias as lithographic prints was not again disputed until the year 1907.   In that year Hempstead & Sons, representing, it seems, the same Meyercord Co., imported decalcomanias at Philadelphia, which were returned by the local appraiser as "surface-coated paper, printed," and assessed for duty at the rate of 3 cents per pound and 20 per cent ad valorem under the provisions of paragraph 398.   The importers claimed that the merchandise was properly dutiable at 20 cents per pound as lithographic prints under the provisions of paragraph 400.   On the hearing before the board the importers offered no evidence or testimony to sustain their contention or to support their protest.   Special counsel representing the Meyercord Co. appeared, however, at the hearing and contended that neither the rate of duty assessed by the collector nor the rate claimed by the importers was correct.   It was argued that mineral colors were used in printing the articles and that they should be assessed at the rate of 45 per cent ad valorem as articles in chief value of metal under the provisions of paragraph 193.   The board declared the claim of special counsel to be without merit and, deciding that the decalcomanias were lithographic prints, sustained the protest.   From this decision an appeal was taken to the United States Circuit Court, Eastern District of Pennsylvania, and in February, 1908, the court, after taking evidence in what was really an ex parte proceeding, found that the decalcomanias were surface-coated paper wholly or partly covered with metal, dutiable under paragraph 398, and a distinct article of commerce different from lithographic prints and printed matter both in manufacture and use.

A reading of the decision in that case in the light of the very complete record in this case leads us to the conclusion that the learned district judge was deprived of the advantage of a bona fide contest and that his findings of fact were based on a one-sided presentation of issues involved.   We can not, therefore, give to his decision the weight which it certainly would have been entitled to receive had there been a genuine litigation of the matter.   For the same reason that decision can not be considered as neutralizing the legal effect of the long-continued, uninterrupted, and well-established departmental practice which had theretofore existed.

As we are of opinion that the goods covered by the protests are lithographic prints and dutiable as such it is unnecessary to enter upon a consideration of the several contentions of the Government which depended for their force on a contrary finding.

The decision of the Board of General Appraisers is *affirmed*.